IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs May 13, 2014

## STATE OF TENNESSEE v. CHRISTOPHER LEE RICHARDSON

**Appeal from the Circuit Court for Bedford County**
**No. 17,420    Lee Russell, Judge**

---

**No. M2013-01178-CCA-R3-CD - Filed June 12, 2014**

---

The defendant, Christopher Lee Richardson, appeals his Bedford County Circuit Court jury convictions of attempted theft of property valued at $1,000 or more but less than $10,000; disorderly conduct; simple possession of a Schedule IV controlled substance; resisting arrest; simple possession of a Schedule VI controlled substance; and attempted promotion of the manufacture of methamphetamine, claiming that the trial court erred by failing to grant his motion to sever the counts of the indictment; that the trial court erred by refusing to disqualify a juror; that the evidence is insufficient to support his convictions of attempted theft of property and attempted promotion of the manufacture of methamphetamine; and that the sentence is excessive. Discerning no error, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3; Judgments of the Circuit Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the Court, in which JOHN EVERETT WILLIAMS and ROGER A. PAGE, JJ., joined.

Gregory D. Judkins, Shelbyville, Tennessee (on appeal); and Catherine Hatcher Hickerson (at trial), Assistant District Public Defender, for the appellant, Christopher Lee Richardson.

Robert E. Cooper, Jr., Attorney General and Reporter; Lacy Wilber, Assistant Attorney General; Charles Crawford, District Attorney General; and Richard Cawley, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

The defendant's conviction of attempted theft of property valued at $1,000 or more but less than $10,000 relates to his attempt to push a shopping cart, fully loaded with merchandise that had not been paid for, out of a Walmart store on January 9, 2012. The

remaining convictions relate to events that transpired at a Rite Aid pharmacy during the defendant's unsuccessful attempt to purchase pseudoephedrine on February 23, 2012.

Doyle Hayes, who was working the third shift as an assistant manager at the Walmart in Shelbyville on January 8, 2012, testified that at some point he "heard the garden center alarm going off on one of [the exterior] exit doors." Mr. Hayes went to the doors but did not see anyone inside the garden center. He did find "a shopping cart full of merchandise" in the garden center. He said that the alarm was emanating from one of the fire doors that opened directly onto the parking lot. The glass sliding doors had been closed, a gate had been lowered over them, and a chain and padlock secured the gate. Mr. Hayes took the cart to the "[l]oss prevention room" without altering the contents. Mr. Hayes said that the defendant did not have permission to take any items from the Walmart without paying for them.

During cross-examination, Mr. Hayes acknowledged that he did not take an inventory of the merchandise in the cart and instead "just kind of looked at it to . . . see [the] stuff that was in it." Mr. Hayes said that he left the shopping cart in the locked loss prevention office. He said that his shift ended at 8:00 a.m., that the day shift managers arrived at 7:00 a.m., and that the loss prevention staff arrived at 8:00 a.m.

Jessica Frandsen testified that she performed "asset protection" for the Shelbyville Walmart. She said that when she arrived at work on January 9, 2012, she observed "[a] buggy full of merchandise" inside the loss prevention office. Ms. Frandsen said that she took the shopping cart to the service desk, where she scanned each item in the shopping cart to determine the dollar amount of the merchandise. She also photographed the cart full of merchandise and then photographed each item individually. She recalled that "[m]ost of the bulkier items were in the bottom of the buggy and then there was a tote that was inside of the buggy. And the tote had merchandise stuffed inside of it and then there was stuff on top of it." Ms. Frandsen testified that the total pre-tax value of the items was $1,505.85.

After determining the value of the items, Ms. Frandsen returned the shopping cart and the merchandise to the loss prevention office and began reviewing the video surveillance from January 8, 2012. Upon reviewing the surveillance, she observed the defendant and another person enter the Walmart. She also observed the defendant pushing the same shopping cart that was later discovered abandoned in the garden center area. Another video showed the defendant attempting to exit the garden center with the shopping cart full of merchandise. When the security alarm sounded, the defendant left the store.

Ms. Frandsen conceded that the defendant did not leave the store with the

merchandise or push the shopping cart across the threshold of the store. She also conceded that the defendant did not run from the store.

Gary Dodson testified that he drove the defendant to the Walmart on January 8, 2012, so that the defendant could "go get a few things for his old lady." Mr. Dodson said that he entered the store with the defendant and then went to the restroom. He then returned to the car to wait for the defendant. He recalled that the defendant was in the store for more than an hour. At one point, Mr. Dodson telephoned the defendant to inquire about the delay, and the defendant told him "to move the car to the other end of the parking lot" "[d]own by the garden center." Mr. Dodson refused to move the car, and when the defendant came out of the store, he was angry with Mr. Dodson. The defendant told Mr. Dodson that "they were following him around, that he left the buggy sitting there, and it was time to go."

Joseph Byrd was working as a technician in the pharmacy department of the Rite Aid pharmacy in Shelbyville on February 23, 2012, when a man came into the store and attempted to purchase Sudafed, an over-the-counter medication containing pseudoephedrine. The cashier then scanned the man's driver's license into the computer to determine whether the man was blocked from purchasing pseudoephedrine. The scan revealed that the man was prohibited from purchasing the drug. When informed that he could not purchase the box of Sudafed, the man appeared confused and acted as though he "didn't understand what could be going on as to why the system would have rejected . . . the sale." Someone suggested that the man attempt to purchase a smaller box of Sudafed, and Mr. Byrd attempted to process the transaction. At some point, however, another employee had telephoned the police, and when the police arrived, the man "[s]tarted acting out." Mr. Byrd said that the man "acted confused . . . and then looked back at the pharmacy and asked why would we call the police on a sick man." The man then became defensive and started yelling and cursing. Mr. Byrd recalled that during the ruckus, "numerous tablets of Sudafed c[a]me out of his pockets."

Scott Tressler, who was working as the pharmacy manager at the Shelbyville Rite Aid on February 23, 2012, testified that a man came into the pharmacy looking to purchase Sudafed. Mr. Tressler saw the man "pacing up and down all the aisles," which Mr. Tressler described as "a red flag for us that someone's here looking for Sudafed that probably doesn't need to be getting any." Mr. Tressler testified that he telephoned the police because one of the technicians told him that the man resembled an individual that the police had been looking for earlier. When the police arrived, the man then began cursing and yelling. He overheard one of the officers tell the man, "If you don't settle down, you got to come with us, is that what you want." When the man refused to calm down, the officers placed him under arrest. After the man was handcuffed, the officers emptied the man's pockets, and Mr. Tressler saw a number of blister packets.

Mr. Tressler said that he could fathom no instance in which a doctor would prescribe two different brands of the same prescription medication.

Brittany Locke testified that she was working at the Rite Aid in Shelbyville on February 23, 2012, when "[a] guy c[a]me in to buy Sudafed and it ended up in an arrest." She said, "He could not buy it and we had a note in the back to call if he had come in." She said that when the man was refused, "[h]e started cussing and acting a little nervous."

Shelbyville Police Department Officer Russ Grubbs testified that on February 23, 2012, he received a call of "an unwanted person" at the Rite Aid. When he arrived at the store, he heard "a person in the rear of the store" who was "cursing and obviously not too happy." The man, whom he identified as the defendant, was "highly irritated," and Officer Grubbs told him "to calm down because he was cursing profusely." When another officer attempted to place the defendant under arrest, the defendant "started to pull away and pretty much got even louder." Officer Grubbs said that the defendant "would not give us his arms" and that, despite the defendant's small stature, "he was Superman that day."

Officer Grubbs testified that a search of the defendant's person following his arrest revealed "a bag of marijuana, a bag of Xanax, and 20 individual pseudoephedrine capsules." He recalled that the pseudroephedrine pills were still in the blister packs but that each of the squares within the blister pack had been separated.

Shelbyville Police Department Officer Tory Moore testified that he, too, responded to the call from the Rite Aid. When he arrived, he "immediately heard somebody loudly cursing and followed the sound to the back of the store," where he found the defendant "pacing back and forth and loudly . . . disputing the fact that they would not sell him cold medicine." Officer Moore told the defendant to calm down, but the defendant responded, "F*** you, Moore, you whore." At that point, Officer Moore informed the defendant that he was being placed under arrest for "disorderly conduct." The defendant "pulled away" and began to resist. Officer Moore said that after he and Officer Grubbs took the defendant to the floor, the defendant "refused to bring his arms out from underneath his chest."

Officer Moore testified that after he handcuffed the defendant, he found "20 pseudoephedrine, a hundred and twenty milligram caps that were in blister pack that was separated" in the defendant's right front pocket and two small plastic bags, one that contained "3.1 or 3.2 grams of marijuana" and one that held "25 one-milligram Xanax, alprazolam pills." The defendant claimed that he possessed both the marijuana and the alprazolam for "personal use." The defendant also said that he possessed the pseudoephedrine for his personal use, and the officer acknowledged that possession of

pseudoephedrine was not illegal.

Tennessee Bureau of Investigation Special Agent and Forensic Scientist Cassandra Franklin-Beavers testified that she examined 24 pills and determined that each contained one milligram of alprazolam. A green plant material was 2.6 grams of marijuana. She also identified pseudoephedrine tablets that were still in the manufacturer's blister pack.

Shelbyville Police Department Officer and 17th Judicial District Drug Task Force Agent Shane George testified that he had developed a specialty in the detection and interdiction of methamphetamine. Agent George explained that pseudoephedrine was a precursor in the manufacture of methamphetamine and that, because of the rise in methamphetamine-related crimes, the legislature had created the Tennessee Methamphetamine Task Force Database to track all pseudoephedrine purchases as well as "collect data on all meth labs that are dismantled or investigated . . . and any individuals that are involved." He also explained "what's referred to as Smurfing where . . . the Smurfs, are individuals that go and actually purchase the pseudoephedrine or the ephedrine and then divert it to the cooks." Agent George testified that the "NPLEx Database," a "national registry," "monitors . . . all the pharmacies nationwide." Agent George said that the NPLEx Database "has a way of limiting your ability to purchase . . . excessive amounts of pseudoephedrine." He testified that "one person can only purchase 3.6 grams of pseudoephedrine within a 24-hour period" and no more than nine grams "within a 30-day period." He said that a purchase would be "blocked" if an individual had exceeded the permitted amount.

Agent George testified that the amount of pseudoephedrine necessary to produce methamphetamine varied, noting, "Of course, a cook wants to get his hands on as much as possible." He said that "the trend has been that they're getting the 2.4 gram boxes or the 3.6 gram boxes, which, of course, is the limit." Agent George explained that "you can do a cook with any amount of pseudoephedrine that you get over the counter," even the "low dose boxes." He said that the normal "yield from a cook is going to be half . . . to three quarters of what the actual amount of pseudoephedrine is in the tablets." He testified that following the purchase of a box of pills containing pseudoephedrine, the purchaser "just as quickly as they can, . . . get the pseudoephedrine out of it, repackage it, and then hide [it] on their person . . . because they feel like if they don't have the packaging around it, then they can't be, it can't be monitored."

Upon examining the photographs of the items from the shopping cart that the defendant abandoned at the Walmart, Agent George testified that the "amount of lithium batteries that are in the picture" stood out to him, as did the "fish tank tubing." He explained that the lithium from the batteries is used as a "reagent in the process to get the

pseudoephedrine to the stage where it's actually converted into meth" and that "the tubing's only used for the gassing off of the . . . methamphetamine." Upon examining the pseudoephedrine tablets seized from the defendant, Agent George testified that the tablets appeared to be "Kroger brand." He said that, generally, a 2.4 gram box of pseudoephedrine would contain 20 such tablets.

During cross-examination, Agent George testified that it was not legal to possess or purchase pseudoephedrine "with the intent to use it to manufacture methamphetamine or with the intent to distribute it to a person that you know is going to use it to manufacture methamphetamine." He stated that purchasing pseudoephedrine from two different pharmacies in the same day was "a huge red flag."

Following the presentation of this testimony, the State rested, and, after a full *Momon* colloquy, the defendant elected not to testify and chose to present no proof.

Based upon the foregoing, the jury convicted the defendant of attempted theft of property valued at $1,000 or more but less than $10,000; disorderly conduct; simple possession of a Schedule IV controlled substance; resisting arrest; simple possession of a Schedule VI controlled substance; and the lesser included offense of attempted promotion of the manufacture of methamphetamine. The jury found the defendant not guilty of possession of a Schedule IV substance with the intent to sell and possession of a Schedule VI controlled substance with the intent to sell. After a sentencing hearing at which the trial court noted that the defendant had five prior felony convictions, 25 prior misdemeanor convictions, and at least nine prior probation revocations in addition to committing the conviction offenses while on parole, the trial court imposed a Range III, total effective sentence of 12 years' incarceration to be served consecutively to the sentence from which the defendant was on parole at the time of the offenses.

The defendant filed a timely but unsuccessful motion for new trial followed by a timely notice of appeal. In this appeal, the defendant contends that the trial court erred by refusing to sever the counts of the indictment, that the trial court erred by refusing to disqualify a juror, that the evidence was insufficient to support his convictions of attempted theft of property valued at $1,000 or more but less than $10,000 and attempted promotion of the manufacture of methamphetamine, and that the sentence is excessive.

*I. Severance*

The defendant asserts that the trial court should have severed count one, which charged attempted theft of property valued at $1,000 or more but less than $10,000, from the remaining counts of the indictment because the offenses were not related in time or character.

-6-

The State contends that any error occasioned by the trial court's refusal to sever the counts was harmless because the evidence of the defendant's guilt was overwhelming.

### A. General Principles

We review the propriety of a trial court's decision regarding the consolidation of indictments or severance of charges for abuse of discretion. *See State v. Garrett*, 331 S.W.3d 392, 401 (Tenn. 2011) (citing *Spicer v. State*, 12 S.W.3d 438, 442 (Tenn. 2000)); *see also State v. Shirley*, 6 S.W.3d 243, 247 (Tenn. 1999). "A trial court abuses its discretion when it applies incorrect legal standards, reaches an illogical conclusion, bases its ruling on a clearly erroneous assessment of the proof, or applies reasoning that causes an injustice to the complaining party." *Garrett*, 331 S.W.3d at 401 (citing *State v. Jordan*, 325 S.W.3d 1, 39 (Tenn. 2010)).

"Before a trial court may deny a severance request, it must hold a hearing." *State v. Dotson*, 254 S.W.3d 378, 387 (Tenn. 2008). Because the determination whether multiple offenses should be joined or separated for trial establishes a format for trial, the issue obviously must be presented and resolved before trial. *See Garrett*, 331 S.W.3d at 403; *see also* Tenn. R. Crim. P. 13(b) (providing that a trial court may order severance of offenses before trial); Tenn. R. Crim. P. 14(a)(1)(A) (providing that a defendant, except in the event of a later arising ground, shall move to sever offenses "before trial"). The trial court must base its decision regarding severance on "the evidence and arguments presented at the hearing," and, as a result, our review on appeal is limited "to that evidence, along with the trial court's findings of fact and conclusions of law." *Spicer*, 12 S.W.3d at 445; *see also Garrett*, 331 S.W.3d at 404 (where supreme court conducted its "analysis on the basis of the evidence adduced at [the d]efendant's trial instead of only the evidence adduced at the hearing" because trial court failed to hold a pretrial hearing).

### B. Severance Hearing Evidence and Trial Court's Findings of Fact and Conclusions of Law

Neither party presented any evidence at the hearing on the defendant's motion to sever the counts of the indictment. The defendant asked the trial court to sever count one, which charged him with attempted theft of property from the Walmart, from counts two through seven, which charged offenses that occurred at the Rite Aid. The defendant also asked that count eight, which charged criminal trespass, be severed from the other counts on the ground that it was based on his being banned from the Walmart for a previous shoplifting offense. The defendant noted that the offenses occurred more than one month apart in different locations.

The State argued that the offenses were all a part of the defendant's continuing plan to manufacture methamphetamine. The prosecutor stated that it was his belief that among the items located in the shopping cart were "several packs of lithium batteries and tubing that would be used to manufacture methamphetamine," but he did not actually present any evidence to support this assertion. The State took the "position that [the defendant's attempt to steal the batteries and the tubing] combined with the . . . 22 pseudoephedrine tablets he had in his pocket on the Rite Aid incident in February, in addition to the fact that he was also" in Rite Aid for the purpose of buying more established that "this is a continuing conspiracy to manufacture methamphetamine." The State argued that evidence of each offense would be admissible in a trial of the others because it would "show that, in fact, Mr. Richardson was trying to make methamphetamine."

The trial court refused to sever counts one through seven, finding that "there is proof of a larger continuing plan or conspiracy and that it appears . . . that there would be evidence in one admissible at the other." The court ruled that count eight should be severed from the remaining counts and tried separately. The trial court made no factual findings.

### C. Relationship Between Procedure Rules 8 and 14 and Evidence Rule 404(b)

Here, all the offenses were charged in a single indictment. Tennessee Rule of Criminal Procedure 8 governs both mandatory and permissive joinder of offenses. Pursuant to that rule, offenses must be joined if they are:

> (A) based on the same conduct or arise from the same criminal episode;
>
> (B) within the jurisdiction of a single court; and
>
> (C) known to the appropriate prosecuting official at the time of the return of the indictment(s), presentment(s), or information(s).

Tenn. R. Crim. P. 8(a). Offenses may be joined for trial if "(1) the offenses constitute parts of a common scheme or plan; or (2) they are of the same or similar character." Tenn. R. Crim. P. 8(b). Regardless whether the joinder of offenses was mandatory or permissive, the defendant may file for a severance of offenses pursuant to Tennessee Rule of Criminal Procedure 14. In cases of mandatory joinder, when the defendant asks for a severance prior to trial, "the court shall grant a severance of offenses . . . when the court finds a severance appropriate to promote a fair determination of the defendant's guilt or innocence of each offense." Tenn. R. Crim. P. 14(b)(2). In cases of permissive joinder, "the defendant has the

right to a severance of the offenses unless the offenses are part of a common scheme or plan and the evidence of one would be admissible in the trial of the others." Tenn. R. Crim. P. 14(b)(1).

Thus, the first question we must answer is whether the joinder of offenses in a single indictment in this case was mandatory or permissive. On appeal, the State does not argue that the trial court's denial of the severance motion was proper and instead asserts only that any error in the trial court's decision was harmless given the overwhelming proof of the defendant's guilt. At the severance hearing, the State argued that because some of the items that the defendant attempted to steal could be used to manufacture methamphetamine and because the defendant already possessed a large amount of pseudoephedrine at the Rite Aid when he attempted to purchase more, the offenses were part of a common scheme or plan to manufacture methamphetamine. Thus, the State never argued that the joinder of the offenses was mandatory. The trial court similarly did not find that joinder of the offenses was mandatory and instead utilized the language of Rule 14(b)(1) relative to the severance of permissibly joined offenses when making its ruling. We agree with the trial court's implicit holding that joinder of the offenses in this case was not mandatory. Accordingly, the defendant had "the right to a severance of the offenses unless the offenses are part of a common scheme or plan and the evidence of one would be admissible in the trial of the others." Tenn. R. Crim. P. 14(b)(1).

As our supreme court has observed,

> the "primary issue" to be considered . . . is whether evidence of one offense would be admissible in the trial of the other[s] if the . . . offenses remained severed. In its most basic sense, therefore, any question as to whether offenses should be tried separately pursuant to Rule 14(b)(1) is "really a question of evidentiary relevance."

*Garrett*, 331 S.W.3d at 402 (citations omitted). Because joining offenses involves admitting proof of crimes committed on one occasion while attempting to prove crimes committed on a separate occasion, the provisions of evidence rule 404(b) are implicated. *Id.* That rule provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes." Tenn. R. Evid. 404(b). Such "other purposes" include "identity (including motive and common scheme or plan), intent, or rebuttal of accident or mistake." *Id.*, Advisory Comm'n Commts. Because of "the inherent risk of the jury convicting a defendant of a crime based upon his or her bad character or propensity to commit a crime, rather than the strength of the proof of guilt on the specific charge," *see*

*Garrett*, 331 S.W.3d at 402, "any doubt about the propriety of the consolidation of similar offenses over a defendant's objection should be resolved in favor of the defendant," *see id.* at 403.

Here, the trial court concluded that the offenses in this case formed part of a common scheme or plan.

> In Tennessee, there are three types of common scheme or plan evidence: (1) offenses that reveal a distinctive design or are so similar as to constitute "signature" crimes; (2) offenses that are part of a larger, continuing plan or conspiracy; and (3) offenses that are all part of the same criminal transaction.

*Shirley*, 6 S.W.3d at 248 (citing Neil P. Cohen et al., *Tennessee Law of Evidence* § 404.11, at 180 (3d ed. 1995)). The offenses in this case clearly do not qualify as "signature crimes" as they were committed by entirely different means. Moreover, no proof exists to suggest that they were part of the same criminal transaction. Indeed, the trial court concluded that the offenses were part of a larger, continuing plan.

"[A] larger, continuing plan or conspiracy 'involves not the similarity between the crimes, but [rather] the common goal or purpose at which they are directed.'" *State v. Denton*, 149 S.W.3d 1, 15 (Tenn. 2004) (quoting *State v. Hoyt*, 928 S.W.2d 935, 943 (Tenn. Crim. App. 1995), *overruled on other grounds by Spicer*, 12 S.W.3d at 447). "This category of continuing plan or conspiracy requires proof of 'a working plan, operating towards the future with such force as to make probable the crime for which the defendant is on trial.'" *State v. Prentice*, 113 S.W.3d 326, 331 (Tenn. Crim. App. 2001) (quoting *Hoyt*, 928 S.W.2d at 943, *overruled on other grounds by Spicer* 12 S.W.3d at 447). "[S]hared motivation for two otherwise unrelated crimes," however, " is not sufficient to establish a 'common scheme or plan.'" *Prentice*, 113 S.W.3d at 332 (citing *State v. Adams*, 859 S.W.2d 359, 362 (Tenn. Crim. App. 1992)).

At the hearing, the prosecutor stated that it was his belief that the shopping cart that contained the items that the defendant attempted to steal contained lithium batteries and tubing, both of which can be used in the manufacture of methamphetamine. That offense occurred on January 8, 2012. As to the remaining counts, the prosecutor stated that the defendant caused quite a ruckus at a Rite Aid store after the pharmacist refused to sell him pseudoephedrine, a methamphetamine precursor, because he had already reached his monthly allowance of the drug. According to the prosecutor, it became apparent during the melee that the defendant already possessed "22 pseudoephedrine pills." Those offenses occurred on February 23, 2012.

The problem that the State faces in our review is that it did not present any evidence at the severance hearing to support its assertions regarding the charged offenses and that its argument for the joinder of offenses was less than clear. Although it is apparent from the proof presented *at trial* that the evidence of the defendant's earlier attempted theft of items used during the manufacture of methamphetamine was admissible to establish his intent to promote the manufacture of methamphetamine by buying pseudoephedrine from the Rite Aid, our review of the denial of the defendant's severance motion is confined to the evidence and arguments presented at the severance hearing. *See Spicer*, 12 S.W.3d at 445. Because the State failed to show via evidence and arguments *at the severance hearing* that the offenses should remained joined, and because, absent such a showing, the defendant had a right to have the permissively joined offenses severed, the trial court erred by denying the defendant's severance motion.

## D. Harmless Error

Having determined that the trial court erred by refusing to sever the offenses, we must next determine whether the error was harmless. *Garrett*, 331 S.W.3d at 405 (citing *Spicer*, 12 S.W.3d at 447). "In making this determination, we consider the whole record and focus on the 'impact the error may reasonably be taken to have had on the jury's decision-making.'" *Id.* (quoting *State v. Rodriguez*, 254 S.W.3d 361, 372 (Tenn. 2008)).

> In this regard, "'the line between harmless and prejudicial error is in direct proportion to the degree . . . by which [the] proof exceeds the standard required to convict . . . .'" *Spicer*, 12 S.W.3d at 447 (quoting *Delk v. State*, 590 S.W.2d 435, 442 (Tenn. 1979)). "'The more the proof exceeds that which is necessary to support a finding of guilt beyond a reasonable doubt, the less likely it becomes that an error affirmatively affected the outcome of the trial on its merits.'" *Toliver*, 117 S.W.3d at 231 (quoting *State v. Gilliland*, 22 S.W.3d 266, 274 (Tenn. 2000)). Nevertheless, we must remain focused not simply on the weight of the evidence, but on 'the actual basis for the jury's verdict.' *Rodriguez*, 254 S.W.3d at 372.

*Id.*

Here, not only was the evidence of the defendant's guilt of each of the offenses overwhelming, but it is clear from the proof adduced at trial that evidence of the defendant's attempted theft of items used in the manufacture of methamphetamine was admissible to establish the defendant's intent to promote the manufacture of methamphetamine by

purchasing pseudoephedrine.  In consequence, the trial court's refusal to sever the offenses, which was erroneous only because of the State's procedural default, was harmless.

## II.  Juror Disqualification

The defendant asserts that the trial court erred by refusing to disqualify Juror Crystal Adams when, just after the jury was empaneled, she advised the court that she recognized the defendant as having been previously employed by her husband.  In a related claim, the defendant avers that the trial court erred by denying his motion to continue the hearing on the motion for new trial so that the defendant could investigate the issue whether Juror Adams exposed the jury to extraneous information in the form of her prior knowledge of the defendant.  The State contends that the defendant waived our consideration of this issue by failing to request Juror Adams' disqualification at trial and by failing to present any evidence that she was impartial at the hearing on the motion for new trial.  The State also contends that the trial court did not err by denying the defendant's motion for a continuance.

Following the empaneling of the jury, Juror Adams informed the court that she recognized the defendant as a former employee of her husband.  Juror Adams insisted that she could "definitely be fair" and that she did not "have hard feelings with" the defendant related to his former employment.  Both parties indicated that they were satisfied that Juror Adams could be fair and impartial, and the trial court did not disqualify her from service.

"Both the United States and Tennessee Constitutions guarantee criminal defendants the right to a trial by an 'impartial jury.'" *State v. Hugueley*, 185 S.W.3d 356, 377 (Tenn. 2006) (citing U.S. Const. amend. VI; Tenn. Const. art. I, § 9).  Although the defendant is entitled to an impartial verdict untainted by extraneous, prejudicial information, the defendant bears the burden of establishing jury misconduct.  *State v. Blackwell*, 664 S.W.2d 686, 688-90 (Tenn. 1984).

Generally, juror disqualifications are based upon one of two theories:  (1) *propter defectum* ("On account of or for some defect."  Black's Law Dictionary 1385 (Rev. 4th Ed. 1968)) or (2) *propter affectum* ("For or on account of some affection or prejudice." *Id.*).  *See Partin v. Henderson*, 686 S.W.2d 587, 589 (Tenn. Ct. App. 1984).  Objections based on general disqualifications, such as familial relationship, fall within the *propter defectum* class and, accordingly, must be challenged prior to the verdict.  *Id.* at 589.  In contrast, disqualifications based upon *propter affectum* exist due to some bias or partiality toward one party in the litigation and may be made after the verdict.  *Toombs v. State*, 270 S.W.2d 649, 651 (Tenn. 1954); *Durham v. State*, 188 S.W.2d 555, 557 (Tenn. 1945); *Partin*, 686 S.W.2d at 589.  Even in cases of *propter affectum*, challenges after the verdict are not proper unless the "'particular disqualification of a juror was unknown to the defendant and

-12-

his attorney at the time of the jury's selection.'" *Durham*, 188 S.W.2d at 557 (quoting *Monday v. State*, 23 S.W.2d 656, 658 (1930)); *see also State v. Akins*, 867 S.W.2d 350, 355 (Tenn. Crim. App. 1993) ("Thus, when a juror conceals or misrepresents information tending to indicate a lack of impartiality, a challenge may be made as here in a motion for new trial.").

Because Juror Adams revealed to the parties and to the court prior to the trial that she recognized the defendant as a former employee of her husband, the defendant was required to make any challenge to her qualification as a juror at that time. The defendant, however, did not present any allegation that Juror Adams should have been disqualified until the hearing on the motion for new trial. Indeed, after a brief voir dire, the defendant agreed that Juror Adams should not be disqualified. He cannot now be heard to complain.

We also conclude that the trial court did not abuse its discretion by denying the defendant's motion for a continuance to explore the possibility that Juror Adams might have exposed the jury to extraneous information. "[T]he granting or denying of a continuance is a matter which addresses itself to the sound discretion of the trial judge." *Moorehead v. State*, 409 S.W.2d 357, 358 (Tenn. 1966) (citing *Bass v. State*, 231 S.W.2d 707 (Tenn. 1950)). An abuse of discretion is demonstrated by showing that the failure to grant a continuance denied the defendant a fair trial or that it could be reasonably concluded that a different result would have followed had the continuance been granted. *State v. Hines*, 919 S.W.2d 573, 579 (Tenn. 1995) (citing *State v. Wooden*, 658 S.W.2d 553, 558 (Tenn. Crim. App. 1983)). "The burden rests upon the party seeking the continuance to show how the court's action was prejudicial. The only test is whether the defendant has been deprived of his rights and an injustice done." *State v. Goodman*, 643 S.W.2d 375, 378 (Tenn. Crim. App. 1982) (citing *Baxter v. State*, 503 S.W.2d 226, 228 (Tenn. Crim. App. 1973)).

At the hearing on the motion for new trial, the defendant referenced Juror Adams' pretrial revelation and asked the trial court for a continuance so that he could "see if Ms. Adams revealed any information to the jurors that may have tainted the jury or anything in that regard." He conceded, however, the record did not suggest that Juror Adams had exposed the jury to extraneous information. The trial court denied the defendant's request for a continuance, observing that the voir dire of Juror Adams did not reflect that she was aware of the defendant's criminal record or that she bore any ill will toward the defendant by virtue of his having been employed by her husband. The court also observed that the defendant had peremptory challenges remaining when he agreed to allow Juror Adams to be seated on the jury. In our view, the trial court did not abuse its discretion by denying the defendant's motion to continue given that the record did not suggest, and the defendant admitted that he had no reason to suspect, that Juror Adams exposed the jury to extraneous information.

*III. Sufficiency*

The defendant next contends that the evidence was insufficient to support his conviction of attempted theft of property valued at $1,000 or more but less than $10,000 because the State failed to establish that the defendant acted with the intent to deprive Walmart of the items in the shopping cart and because the State failed to establish that the items contained in the cart at the time it was abandoned were actually placed into the cart by the defendant. He also claims that the evidence was insufficient to support his conviction of attempted promotion of the manufacture of methamphetamine. The State asserts that the evidence was sufficient to support the convictions.

We review the defendant's challenge to the sufficiency of the evidence mindful that our standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 324 (1979); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). "[D]irect and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." *State v. Dorantes*, 331 S.W.3d 370, 381 (Tenn. 2011).

When examining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Winters*, 137 S.W.3d at 655. Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

*A. Attempted Theft of Property*

"A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." T.C.A. § 39-14-103. Pertinent to our analysis, our Code defines deprive as to "[w]ithhold property from the owner permanently or for such a period of time as to substantially diminish the value or enjoyment of the property to the owner." *Id.* § 39-11-106(a)(8)(A). As is applicable here,

> [a] person commits criminal attempt who, acting with the kind
> of culpability otherwise required for the offense [a]cts with
> intent to complete a course of action or cause a result that would

-14-

constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

*Id.* § 39-12-101(a)(3).

The defendant first asserts that the State failed to establish that he intended to deprive Walmart of the ownership of the property. "The intent to deprive an owner of property may be established by circumstantial evidence." *State v. James W. Griffith*, No. M2007-02164-CCA-R3-CD, slip op. at 9 (Tenn. Crim. App., Nashville, Sept. 24, 2009) (citing *State v. Scales*, 524 S.W.2d 929, 931 (Tenn. 1975)). Here, the evidence established that the defendant asked Mr. Dodson for a ride to the Walmart so that the defendant could "go get a few things for his old lady." The two men entered the Walmart together, and Mr. Dodson went to the restroom. Mr. Dodson returned to the car and spoke with the defendant via telephone after approximately one hour, and the defendant asked Mr. Dodson to move the car to the Garden Center side of the Walmart. Mr. Dodson refused, and the defendant returned to the car angry with Mr. Dodson. Surveillance video showed the defendant push the loaded shopping cart into the Garden Center area and attempt to leave with the cart. When the security alarms sounded, the defendant abandoned the cart and left the store. In our view, the circumstantial evidence established that the defendant intended to leave the Walmart without paying for the items in the shopping cart.

The defendant next asserts that because the shopping cart remained unattended overnight, "there is no way to reasonably be sure that the items [Ms. Frandsen] valued in the morning many hours after [the defendant] had left the store were actually the same items in the buggy at the time [the defendant] was in the store." "Value," as is applicable in this case, is defined as

(i) The fair market value of the property or service at the time and place of the offense; or

(ii) If the fair market value of the property cannot be ascertained, the cost of replacing the property within a reasonable time after the offense;

T.C.A. § 39-11-106(a)(36)(A)(i)-(ii).

At trial, Mr. Hayes testified that he collected the cart from its place of abandonment and secured it inside the loss prevention office, which could be accessed only

-15-

by staff members with a key. He stated that he was the only individual with a key to that office who was in the store overnight. Ms. Frandsen said that when she arrived to work in the morning, she found the shopping cart locked in the loss prevention office. Although she admitted that she had testified at the preliminary hearing that she found the cart behind the service desk, she said that she had at that time confused the defendant's case with another. The jury, as the final arbiter of witness credibility, accredited Ms. Frandsen's testimony that she found the cart in the loss prevention office and that the items in the cart were placed there by the defendant. We may not disturb their conclusion.

### B. Attempted Promotion of Methamphetamine Manufacture

As charged in this case, "[a] person promotes methamphetamine manufacture who. . . [s]ells, purchases, acquires, or delivers any chemical, drug, ingredient, or apparatus that can be used to produce methamphetamine, knowing that it will be used to produce methamphetamine, or with reckless disregard of its intended use." T.C.A. § 39-17-433(a)(1). The defendant claims that the State failed to establish that the defendant "was involved in producing methamphetamine in any way." In our view, however, the defendant's attempt to purchase pseudoephedrine when he was already in possession of a sizable amount of that drug, his earlier attempt to steal items commonly used in the manufacture of methamphetamine, and his overblown reaction to being told that he could not purchase more pseudoephedrine all established that the defendant attempted to purchase pseudoephedrine knowing that it would be used to produce methamphetamine.

### IV. Sentencing

The defendant contends that the trial court erred by sentencing him as a Range III offender and by imposing the maximum sentence for each of his convictions. The State avers that the sentence was appropriate.

"[A]lthough the statutory language continues to describe appellate review as de novo with a presumption of correctness," the 2005 revisions to the Sentencing Act "effectively abrogated the de novo standard of appellate review." *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). Observing that a change in our standard of review was necessary to comport with the holdings of the United States Supreme Court, our supreme court "adopt[ed] an abuse of discretion standard of review, granting a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *Id.*

Despite the new standard of review, trial courts must still consider the principles of sentencing enumerated in Code section 40-35-210(b), *see Bise*, 380 S.W.3d at

-16-

698 n.33 (citing T.C.A. § 40-35-210(b)), 706 n.41, and must, as required by statute, consider "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant . . . in determining the sentence alternative or length of a term to be imposed." *Id.* § 40-35-103(5). The court cautioned that, despite the wide discretion afforded the trial court under the revised Sentencing Act, trial courts are "still required under the 2005 amendments to 'place on the record, either orally or in writing, what enhancement or mitigating factors were considered, if any, as well as the reasons for the sentence, in order to ensure fair and consistent sentencing.'" *Bise* at 706 n.41 (citing T.C.A. § 40-35-210(e)).

## A. Range Classification

The defendant concedes that he had the requisite number of prior convictions to be sentenced as a Range III offender but asserts that he should have been sentenced as a Range II offender because that was the range listed in the State's Notice Seeking Enhanced Punishment. The defendant concedes, and the record establishes, that the notice accurately listed all of the defendant's prior felony convictions.

In our view, the trial court did not err by sentencing the defendant as a Range III offender.

> The purpose of the statutory notice of intent to seek enhanced sentencing is to (a) provide fair notice to an accused that he/she is exposed to other than standard sentencing, (b) to facilitate plea bargaining, (c) to enable the accused to make an informed decision before entering a guilty plea, and (d) to a certain extent, to aid in trial strategy.

*State v. Livingston*, 197 S.W.3d 710, 712 (Tenn. 2006). As a general rule, "when the State has substantially complied with [Tennessee Code Annotated section] 40-35-202(a), an accused has a duty to inquire about an ambiguous or incomplete notice and must show prejudice to obtain relief." *State v. Adams*, 788 S.W.2d 557, 559 (Tenn. 1990). Although the State's notice provided that the defendant was a Range II offender, it accurately listed all of the defendant's qualifying convictions. Moreover, the defendant conceded at the sentencing hearing that he was aware of his criminal record, aware of the law concerning range classification, and that he would not have prepared any differently had the State's notice indicated that he was a Range III offender. As such, he has failed to show that he was prejudiced by the State's notice.

*B. Sentence Length*

Lastly, the defendant contends that the trial court erred by imposing the maximum sentence within the range for each of his convictions.

The trial court, in imposing the sentence, applied enhancement factors based upon the defendant's extensive criminal history, his failure to comply with previous sentences involving release into the community, and his committing the conviction offenses while on parole. *See* T.C.A. § 40-35-114(1), (8), (13). As indicated, the trial court observed that the defendant had five prior felony convictions, 25 prior misdemeanor convictions, and nine prior probation revocations. In addition, the court observed that the defendant was released on parole on January 10, 2011, and "was still out as an absconder" when the offenses in this case were committed. The defendant's record of criminal activity and failure to abide by the terms of his previous grants of probation and parole clearly justified the imposition of the maximum sentence within the range for each of his convictions.

*Conclusion*

The trial court erred by denying the defendant's severance motion, but the error was harmless. The trial court did not err by refusing to disqualify Juror Adams or by denying the defendant's motion to continue the hearing on the motion for new trial. The evidence was sufficient to support the defendant's convictions of attempted theft of property valued at $1,000 or more but less than $10,000 and attempted promotion of the manufacture of methamphetamine. Finally, the trial court did not err by sentencing the defendant as a Range III offender or by imposing the maximum sentence within the range for each of the defendant's convictions.

Accordingly, the judgments of the trial court are affirmed.

_____
JAMES CURWOOD WITT, JR., JUDGE